IN THE UNITED STATES FEDERAL COURT
NORTHERN DISTRICT, OHIO

| | |
|---|---|
| KEVIN CRONIN | ) |
| | ) |
| *and* | ) CASE NO. 09 CV 2699 |
| | ) |
| CLEVELANDBIKES | ) JUDGE SOLOMON |
| *a 501 (C)(3) not for profit organization* | ) OLIVER, JR. |
| *organized under the laws of Ohio,* | ) |
| *plaintiffs,* | ) MAGISTRATE JUDGE |
| | ) BAUGHMAN |
| *v.* | ) |
| | ) MEMORANDUM IN |
| THE OHIO DEPARTMENT OF | ) SUPPORT OF MOTION |
| TRANSPORTATION | ) FOR TEMPORARY |
| | ) RESTRAINING |
| *and* | ) ORDER AND |
| | ) INJUNCTION |
| THE U.S. DEPARTMENT OF | ) |
| TRANSPORTATION, FEDERAL | ) |
| HIGHWAY ADMINISTRATION | ) |
| *defendants.* | ) |
| | ) |
| | ) |
| | ) |

**INTRODUCTION:**

Plaintiff Kevin Cronin ("Cronin") is a Cleveland resident who rides a bicycle to commute to work and for recreational activity, in and around Cleveland, as well as an officer in the organization ClevelandBikes. ClevelandBikes ("CLEVELANDBIKES") is 501(C)(3) not for profit corporation, organized under the laws of Ohio, committed to advancing all forms of bicycling as healthy recreation, sport and transportation.

In 2009, an application for a restraining order was denied, citing a lack of urgency to the potential harm as no bridge construction contracts had been accepted, but acknowledged subsequent developments could warrant review. The application for injunctive relief is re-

initiated at this time as Defendant ODOT has issued a decision accepting one of the design proposals, awarding a contract for the bridge construction (see ODOT press release of September 9, 2010, **Attachment A**). Under the terms of the contracting process ODOT, with its federal partner FHWA can proceed with 30% of the design in place. *Injunctive relief is extraordinarily timely as the 30% design stage presents opportunity to remedy the plan to incorporate pedestrian and cycling access with a dedicated walking/cycling path.*

Plaintiffs allege and state the following:

In 2009, the State of Ohio sought out and received federal funds through the United States Department of Transportation ("stimulus funds") to implement a project to redesign and reconstruct portions of Ohio Interstate 90.

In 2009, ODOT released a DRAFT ENVIRONIMENTAL IMPACT STATEMENT ("DEIS"), intending to address various obligations under federal law, which describes the impact of the innerbelt plan on humans and their environment, as well as comparing transportation alternatives. During ODOT's public hearings on the Innerbelt project in April 2009, as well as other preceding ODOT proceedings, cyclists and pedestrians presented orally, as well as in writing, comments critical of the ODOT plan. Among the points raised were:

❖ By closing highway exits in the manner proposed, ODOT will increase street congestion, the level of harmful pollutants and provide less safety for cyclists, including areas where cyclists are encouraged to ride, under the Cuyahoga County approved bike plan. The bike plan includes cycling on east-west streets and north-south streets in and around the affected area.

❖ If the ODOT innerbelt plan were to be approved, it would result in more cars and trucks on Cleveland streets, including the approved bikeway of Chester Avenue and Superior Avenue, as well as the highway feeder streets of East 24th St., East 30th St. and East 55th St. and the areas controlled by Cleveland State University, raising a number of concerns for cyclist and pedestrian safety. Some of the risks:
    *More and heavier trucks,* with their longer stopping distances, create added safety risks for those cyclists traveling on the streets or pedestrians;
    *Harmful diesel fuel emissions* shift higher health burdens to cyclists and pedestrians on or along the road;
    Fewer highway access and exit will create *longer and more frequent car and truck idling and congestion* at the exits and along feeder streets, decreasing air quality, again, increasing health burdens for cyclists and pedestrians on or along the road; and

*Reducing the area bike plan's already limited routes north and south in the central city*, as congestion worsens.

❖ ODOT's Environmental Impact Statement (EIS) denies cyclist and pedestrian access to the innerbelt bridge. By denying bridge access, though cyclists ride at either end of the proposed bridge, ODOT sacrifices pedestrian and cyclist safety, health and convenience, for the benefit of motorized vehicular traffic to and through Cleveland. ODOT reports state that bicycle and pedestrian accommodation on the bridge is unnecessary as cyclists and pedestrians have alternative routes east and west through the flats or over other bridges. ODOT exaggerates the value and suitability of the alternatives:

- *The Flats roadway is an unsafe route*, with a very high volume of trucks, broken pavement, poor lighting and, in winter, very limited visibility and limited non-road options for pedestrians.
- *The Lorain-Carnegie and Detroit-Superior Bridges accommodations were laudable retro-fit plans, but are often safety hazards and regularly strewn with glass.* A well-designed cycling and pedestrian opportunity on a new Innerbelt Bridge Project represents an extraordinary opportunity to get things right, right from the start.
- *The availability of alternatives hasn't prevented cyclist and pedestrian accommodation in other cities or pedestrian use of the current innerbelt bridge.* There are 25-30 interstate highway bridges with cycling and pedestrian access, with individuals walking on the current innerbelt bridge.
- *Bicycle and pedestrian accommodation on the Innerbelt Bridge would stand up to cost-benefit analysis.* Last summer, ODOT posted cost ranges it considered to be acceptable for all bridge options, yet successful cyclist and pedestrian accommodation has already been acknowledged by ODOT to be well below these acceptable cost ranges.

❖ *Providing cycling and pedestrian access to the bridge provides a large return for its low cost.* The financial value of improved mobility, measured by fuel savings, greenhouse gas reductions, and business and individual health care savings, ranges between $10-65 billion, outstripping any public spending costs in creating a bicycling and walking transportation infrastructure. Modest increases in bicycling and walking could lead to an annual reduction of 70 billion miles of car travel, with higher increases cutting as much as 200 billion miles per year. The decreased auto travel represent savings for Ohio businesses and individuals, equal to cutting oil dependence and greenhouse gas emissions from passenger vehicles by 3-8%.

❖ *ODOT's review of the impact and opportunity to advance cycling and pedestrian interests was hardly "rigorous" and often not even present in its DEIS.* ODOT has not conducted an "exploration and an objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects" as directed in the transportation and environmental laws and regulations.
**(See full document, <u>Attachment B</u>).**

By denying cyclist and pedestrian access to the innerbelt bridge, ODOT decreases safety for

cyclists and pedestrians lawfully on Cleveland roads.

For a variety of reasons, the ODOT plan documented in the DEIS and EIS is inadequate, failing to address important requirements to ensure cyclist and pedestrian safety or respond to the issues plaintiffs raise. The Innerbelt plan fails to evaluate the impact of increased car and truck traffic on Cleveland streets and increased traffic idling as cars and trucks await entrance to the highway on the health and safety of cyclists and pedestrians lawfully traveling on the streets and sidewalks of the area. *The Innerbelt plan fails to do the necessary evaluation, casting both the process and the product in doubt. ODOT risks public health, public safety and state and local government budgets, saddling them with an inefficient investment of public dollars for years to come.*

## ARGUEMENT:

**ODOT SHOULD BE ENJOINED FROM PROCEEDING AS THEIR INNERBELT PLANS ARE DELETERIOUS TO THE HEALTH AND SAFETY OF CLEVELAND RESIDENTS AND ODOT HAS NOT MET ITS OBLIGATIONS FOR OPEN DECISION-MAKING UNDER FEDERAL LAW AND WILL DEPRIVE PLAINTIFFS OF REMEDIES IF ALLOWED TO PROCEED.**

*The Ohio Department of Transportation has created a plan deleterious to the health and safety of Northeast Ohio cyclists, pedestrians and other Cleveland residents*, without meeting its obligations under federal transportation, environmental and administrative procedure laws to analyze the impact on cyclists, pedestrians and alternatives to address transportation priorities. The ODOT plan places the safety and health of Ohioans at risk, compounds costs, creates additional impediments and forfeits time in which to craft a successful plan which complies with ODOT's obligations under the law.

As ODOT has not yet begun to work on the bridge, but has accepted 30% of the design plan, Northeast Ohio is at a unique position, able to modify plans to incorporate pedestrian and cycling goals, without risking the bridge construction process as a whole.

Plaintiffs acknowledge that a temporary restraining order is an extraordinary remedy. The issue whether to grant or deny an injunction is a matter solely within the trial court's discretion. A

reviewing court should not disturb the judgment of the trial court absent an abuse of discretion. **Danis Clarkco Landfill Co. v. Clark County Solid Waste Management District**. 73 Ohio St.3d 590, 604, 653 N.E.2d 646 (1995). Also see, **Workman v. Bredeson**, 486 F.3d 896, 904 (6th Cir. 2007). However, in evaluating the factors involving the innerbelt bridge, the need for a restraining order is abundantly clear. The propriety of a Temporary Restraining Order is evaluated with the following factors:

1. The likelihood or probability of plaintiff's success on the merits;
2. Whether the issuance of the order will prevent irreparable harm to the plaintiff;
3. What injury to others will be caused by the granting of the order;
4. Whether the public interest will be served by the granting of the order.

**Cleveland v. Cleveland Elec. Illum. Co.**, 115 Ohio App.3d 1, 14, 684 N.E.2d 343 (Eighth Dist. Ct. App., Cuyahoga Cnty., 1996). Also see, **Northeast Ohio Coalition for the Homeless v. Blackwell**. 467 F.3d 999, 1009 (6th Cir., 2006).

Ohio Courts acknowledge that each element must be established by clear and convincing evidence. **Meade v. Beverly Enterprises-Ohio, Inc.**, 154 Ohio App.3d 521, 797 N.E.2d 1040 (Eleventh Dist. Ct. App., Lake Cnty., 2003). The burden of persuasion is on the party seeking relief. In determining whether to grant this relief, no one factor is dispositive. **City of Cleveland v. Cleveland Electric Illuminating Co.**, 115 Ohio App.3d 1, 14, 684 N.E.2d 343 (Eight Dist. Ct. App, Cuyahoga Cnty., 1996). The four factors must be balanced with the "flexibility which traditionally has characterized the law of equity." Id. (citing **Friendship Materials, Inc. v. Michigan Brick, Inc.**, 679 F.2d 100, 105 (6th Cir. 1982).

> A temporary restraining order is an injunctive form of relief intended to prevent the applicant from suffering immediate and irreparable harm. Civ.R. 65(A). In determining whether to grant a temporary restraining order, a trial court must consider whether the movant has a strong or substantial likelihood of success on the merits of his underlying claim, whether the movant will be irreparably harmed if the order is not granted, what injury to others will be caused by the granting of the motion, and whether the public interest will be served by the granting of the motion. Corbett v. Ohio Bldg. Auth., 86 Ohio App.3d 44, 49, 619 N.E.2d 1145 (10th Dist. Ct. App., Franklin Cnty., 1993). **Coleman v. Wilkinson**, 147 Ohio App.3d 357, 770 N.E.2d 637, 2002 (Tenth Dist. Ct. App., Franklin Cnty., 2002).

Also see, **Miller v. Skumanick**, 605 F.Supp.2d 634, 641 (M.D. Pa. 2009) ("The above factors merely 'structure the inquiry' and no one element will necessarily determine the outcome. The court must engage in a delicate balancing of all the elements, and attempt to minimize the

probable harm to legally protected interests between the time of the preliminary injunction to the final hearing on the merits.").

A prohibitory temporary restraining order is an interim temporary restraining order to prevent or restrain a party from doing something adverse to the plantiff during the pendency of the action for which there is no adequate legal remedy. **Snelling and Snelling, Inc. v. ARICO, Inc.**, 83 Ohio App.3d 89, 95, 613 N.E.2d 1107 (Tenth Dist. Ct. App., Franklin Cnty., 1993). The Temporary Restraining Order seeks to lock the parties in place, creating the opportunity to fully evaluate the circumstances, providing the full benefit of the information and analysis the law and regulations require:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Id. But see Leary,* 228 F.3d at 739 (noting that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion").
> When considering a motion for preliminary injunction, a district court must balance four factors … These four considerations are "factors to be balanced, not prerequisites that must be met." *Jones,* 341 F.3d at 476 (citing *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985)).
> **Certified Restoration Dry Cleaning v. Tenke**, 511 F.3d 535, 543 (6th Cir. 2007).

Under the criteria of the four point formula, a Temporary Restraining Order should issue to permit a more comprehensive review of the ODOT innerbelt plan.

## A. **Liklihood of Success**

*A plaintiffs' potential for success is the first critical factor to address in the TRO analysis. A plaintiff need not establish his case in full, but must demonstrate some strength and potential for success.* Plaintiffs have filed a complaint for violating environmental and transportation laws and the Administrative Procedure Act.

**Federal Environmental and Transportation Laws:**

Plaintiffs satisfy the first element of the test, their potential for success, as defendant's conduct in preparing the innerbelt plan has ignored and evaded their responsibilities to cyclists, pedestrians and other Cleveland residents.

When viewed in the light most favorable to the plaintiff, the plaintiff has demonstrated a strong likelihood of success on the merits of his claim. A party is not required to prove his case in full; however, in order to establish success on the merits of a claim, a movant must show a strong or substantial liklihood or probablility of success on the merits. **Coleman v. Wilkinson**, 147 Ohio App.3d 357, 358 (Tenth Dist. Ct. App., Franklin Cnty., 2002). Also see, **Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.**, 511 F.3d 535, 543 (6th Cir., 2007), where the Sixth Circuit Court stated that "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more delibrate investigation." Also see, **Miller v. Skumanick**, 605 F.Supp.2d 634, 643 (M.D. Pa. 2009) ("The court must first determine whether the plaintiffs have a reasonable likelihood of success on the merits of their claims. *Crissman*, 239 F.3d at 364. The court's opinion here should not be taken as a final adjudication on the merits, but simply a brief explanation of whether a reasonable probability exists that the plaintiffs will prevail.").

ODOT's DEIS and EIS for the innerbelt project are virtually silent regarding the project's impact on cycling and pedestrian health and safety. Federal project documents acknowledge congestion burdens and delays will be higher in the city, but are offset by savings and efficieciencies in proceeding onto and through the Innerbelt system (FHWA Record of Decision, 9//18/09; p. 29 **Attachment C**). ODOT has only acknowledged benefits for those driving on the innerbelt, who achieve greater efficiencies the further they proceed in leaving the city.

*For those roadway users who do not proceed on or through the innerbelt system, whether via bicycle, motor vehicle or on foot, the burdens of the innerbelt plan will be higher. The innerbelt shifts burdens from lengthy innerbelt users, presumably those living outside of and commuting into the City of Cleveland or driving entirely through the City, to non-users or less lengthy innerbelt users.* These shifted costs are adverse health and safety. The ODOT DEIS

and EIS are deficient in failing to address their obligation to evaluate their proposed state action on cyclists and pedestrians. These deficiencies are in derrogation of ODOT responsibilities under numerous federal regulations, including:

- **23 CFR 652.5** that *"[t]he safe accommodation of pedestrians and bicyclists should be given full consideration during the development of Federal-aid highway projects, and during the construction of such projects."* Further: *"On highways without full control of access where a bridge deck is being replaced or rehabilitated, and where bicycles are permitted to operate at each end, the bridge shall be reconstructed so that bicycles can be safely accommodated when it can be done at a reasonable cost. Consultation with local groups of organized bicyclists is to be encouraged in the development of bicycle projects."*

- **23 CFR 652.5** *(g) (1) Bicycle transportation facilities and pedestrian walkways shall be considered, where appropriate, in conjunction with all new construction and reconstruction of transportation facilities, except where bicycle and pedestrian use are not permitted .... (2) Transportation plans and projects shall provide due consideration for safety and contiguous routes for bicyclists and pedestrians.*

- **23 CFR 450.300:** The purposes of this subpart are to implement the provisions of 23 U.S.C. 134 and 49 U.S.C. 5303, as amended, which:
  - *(a)* Sets forth the *national policy* that the MPO designated for each urbanized area is to carry out a *continuing, cooperative, and comprehensive multimodal transportation planning process,* including the development of a metropolitan transportation plan and a transportation improvement program (TIP), that encourages and promotes the safe and efficient development, management, and operation of surface transportation systems to serve the mobility needs of people and freight *(including accessible pedestrian walkways and bicycle transportation facilities) and foster economic growth and development, while minimizing transportation-related fuel consumption and air pollution.*

- 23 USC § 217. Bicycle transportation and pedestrian walkways, which establishes:
  - (e) Bridges. - *In any case where a highway bridge deck being replaced or rehabilitated with Federal financial participation is located on a highway on which bicycles are permitted to operate at each end of such bridge, and the Secretary determines that the safe accommodation of bicycles can be provided at reasonable cost as part of such replacement or rehabilitation, then such bridge shall be so replaced or rehabilitated as to provide such safe accommodations.*
  - (g) Planning and Design. -
    - (1) *In general. - Bicyclists and pedestrians shall be given due consideration in the comprehensive transportation plans developed by each metropolitan planning organization and State* in accordance with sections 134 and 135, respectively. Bicycle transportation facilities and pedestrian walkways shall be considered, where appropriate, in conjunction with all new construction and reconstruction of transportation facilities, except where bicycle and pedestrian use are not permitted.
    - (2) *Safety considerations. - Transportation plans and projects shall provide due consideration for safety and contiguous routes for bicyclists and pedestrians.* Safety considerations shall include the installation, where appropriate, and

maintenance of audible traffic signals and audible signs at street crossings.

- **101(b) of National Environmental Policy Act ("NEPA")**, which establishes that EPA pollution, noise, undesirable land use patterns, or impacts on public parks and recreation areas, wildlife and waterfowl refuges, or on historic sites, damage to life systems. *traffic congestion, threats to health, or other consequences* adverse to the environmental goals set out in section.

- **Section 102(2)(D) of NEPA** requires the responsible agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *A rigorous exploration and an objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, are essential. Sufficient analysis of such alternatives and their environmental benefits, costs, and risks should accompany the proposed action through the review process <u>in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects.</u>*

"Foreclosing prematurely" is exactly what ODOT's innerbelt plan and plan documents action seek to compel. The DEIS and EIS fail to consider cycling and pedestrian health and safety, and rush to implement their ill-conceived plan. Having announced contract decisions for the 30% design threshold to allow the plan to move forward, injunctive relief is appropriate. Plaintiffs have provided ample basis on which to demonstrate the likelihood to prevail and the Temporary Restraining Order should issue.

The environmental law requirement are not some abstract issue, but a requirement imposed to adequately inform decision-makers and allow a full airing of environmental issues:

> The National Environmental Policy Act provides that a detailed environmental impact statement shall be prepared for "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. *The purpose of an environmental impact statement is to provide full and fair discussion of significant environmental impacts and to inform decision makers and the public of reasonable alternatives which would minimize adverse impact to the environment* 40 C.F.R. § 1502.1. The environmental impact statement must discuss: (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C).
> **City of Sausalito v. O'Neill**, 211 F.Supp.2d 1175, 1190-91 (N.D.Cal. 2002). (Emphasis added).

In a case involving the National Park Service, the Court noted that the agency failed to document its decision-making on the very subject the statute sought to protect, noise pollution in the park, which it considered to be the very essence of arbitrary and capricious agency action:

> The ROD then states that the decision will be " beneficial in Yellowstone... compared to current use," *id.,* and concludes that " [i]mpairment of park resources will not occur; the level of oversnow vehicle sound under the decision will not harm the integrity of park resources and values." *Id.* NPS entirely fails to explain why a finding of minor, moderate, and major adverse impacts on soundscapes does not constitute impairment, let alone the lesser threshold of " unacceptable impacts." The NPS Policies clearly define an unacceptable impact as one that would " unreasonably interfere with ... the natural soundscape maintained in wilderness and natural, historical, or commemorative locations within the park." 2007 ROD at 29. Like the Court in *Mainella,* this Court is equally perplexed as to why any impact characterized as "major and adverse" does not constitute an unacceptable impact, let alone impairment. This is a distinction NPS again fails to explain. *See Mainella,* 459 F.Supp.2d at 102, n. 24. There is no higher level than "major" on the impact scale. NPS provides no explanation as to how the most adverse impacts can still be considered acceptable....the Court finds that the non-impairment conclusion regarding impacts to the natural soundscape in the parks is fundamentally arbitrary and capricious.
> **Greater Yellowstone Coalition v. Kempthorne,** 577 F.Supp.2d 183, 201-02 (D.D.C. 2008).

The Court proceeded to note that administrative agencies are often the beneficiary of deference, but deference is only warranted when the facts asserted bear relationship to the decisions made and clearly provide sufficient data to the decision-maker:

> The Court concluded, "the Winter Use Plan, as codified in the Final Rule and explained in the 2007 ROD, is arbitrary and capricious, unsupported by the record, and contrary to law. In contravention of the Organic Act, the Plan clearly elevates use over conservation of park resources and values and fails to articulate why the Plan's "major adverse impacts" are "necessary and appropriate to fulfill the purposes of the park."
>
> *Furthermore, the FEIS in support of the Plan does not provide the decision-maker with a clear analysis of the alternatives that NEPA requires.* Chief among its failings, the FEIS relies on admittedly inaccurate sound modeling data, employs a park-wide metric that dilutes the Plan's impacts on soundscapes and air quality, and utterly fails to explain why none of the seven alternatives would constitute "impairment" or unacceptable impacts. According to NPS's own data, the WUP will increase air pollution, exceed the use levels recommended by NPS biologists to protect wildlife, and cause major adverse impacts to the natural soundscape in Yellowstone. Despite this, NPS found that the plan's impacts are wholly "acceptable," and utterly fails to explain this

incongruous conclusion. Put simply, the WUP provides "no rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C.Cir.2006). While the Court will defer to an agency's exercise of expertise, the "Court will not defer to the agency's conclusory or unsupported assertions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C.Cir.2004)." **Greater Yellowstone Coalition v. Kempthorne**, 577 F.Supp.2d 183, 209-10 (D.D.C. 2008). (emphasis added).

Like the US Parks Service administrative action, ODOT failed to provide information offered at public hearings that cyclists and pedestrians sought a bike path on the proposed innerbelt bridge and to provide a multi-use path would represent positive steps for cycling access, public safety and public health. *It should come as no surprise that FHWA did not require bicycle/pedestrian access to the bridge. ODOT made sure they only heard one side of the argument. How can anyone have confidence in the credibility of the FHWA decision-making process? Defendant harmed not only Northeast Ohio cyclists and pedestrians, but FHWA as well by depriving them of important information presented in public hearings created specifically to inform federal decision-makers.*

**Administrative Procedure Act:**

The Administrative Procedure Act (or "APA", P.L. 79-404APA, chapter 5, sections 511-599) requires federal agencies creating rules and regulations necessary to implement and enforce mjor legislative acts to satisfy certain requirements. The APA provides a framework for the adequacy of the review of federal action. "The goal of the administrative review is to ensure that the decision-maker had sufficient information for informed decision-making, the 'touchstone for the court's inquiry," **City of Sausalito v. O'Neill, 211 F.Supp.2d 1175, 1192 (N.D.Cal. 2002)**, as well as engage the public in meaningful ways:

> In making this determination, a court must make a " 'pragmatic judgment whether the environmental impact statement's form, content, and preparation *foster both informed decision-making and informed public participation.'*
> **City of Sausalito v. O'Neill, 211 F.Supp.2d 1175, 1191 (N.D.Cal. 2002)**. (emphasis added).

A challenge to agency conduct under the APA is a review of the consequences flowing from the administrative decision. While the agency identifies areas of review, merely identifying and

dispatching issues is insufficient in meeting its obligations under the law. The state cannot create "straw" arguments only to knock them down. Ultimately, the adequacy of the agency action needs to be reviewed to understand whether a framework was created to fully evaluate all relevant concerns:

> The range of alternatives that is deemed reasonable derives from the environmental impact statement's Purpose and Need section, which defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13; *see also City of Carmel*, 123 F.3d at 1155 ("*The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms.*").
> **City of Sausalito v. O'Neill, 211 F.Supp.2d 1175, 1192 (N.D.Cal. 2002).** (emphasis added)

Later, the California District Court elaborated:

> There is no magic number of alternatives that must be considered; all that is required is the agency consider *all alternatives reasonably related* to the purposes of the project. *Laguna Greenbelt*, 42 F.3d at 524.
> **City of Sausalito v. O'Neill, 211 F.Supp.2d 1175, 1193 (N.D.Cal. 2002).** (emphasis added)

APA furnishes sufficient basis for plaintiffs to challenge the FHWA Record of Decision, which is based upon the ODOT EIS, which is faulty for failing to address cycling and pedestrian interests in their planning and evaluation as required by federal transportation and environmental laws.

Agency compliance with environmental and transportation laws are reviewed under the APA, requiring a determination of whether the agency's final action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." **Okanogan Highlands Alliance v. Williams**, 236 F.3d 468, 471 (9th Cir.2000); Also see, **City of Carmel-by-the-Sea v. U.S. Dept. of Transportation**, 123 F.3d 1142, 1150 (9th Cir.1997) ("... we defer to agency opinion if it is not otherwise shown to be arbitrary and capricious.").

In evaluating an *arbitrary or capricious* standard, courts look to criteria established by Congress. Use of other criteria or ignoring congressionally mandated criteria is indicia of unsatisfactory decision-making:

> We may reverse the agency's decision as arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
> **Western Radio Servs. Co., Inc. v. Espy**, 79 F.3d 896, 900 (9th Cir.1996).

Defendants ODOT and FHWA violated the APA by narrowly defining the innerbelt project moving trucks and cars to and through Cleveland, with no consideration to the role of pedestrians and cyclists of Cleveland. The decisions increase the health and safety risk of individuals using the streets and roads of Cleveland, those crossing roads with increased congestion resulting from the closed exits, while routing cyclists and pedestrians through a longer route to downtown. When reviewing for an APA violation, courts look to whether the Environmental Impact Statement addressed issues sufficiently to enable an evaluation of the environmental consequence ("whether an environmental impact statement contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.") **Churchill County v. Norton**, 276 F.3d 1060, 1071 (9th Cir.2001) (quoting **Trout Unlimited v. Morton**, 509 F.2d 1276, 1283 (9th Cir.1974)). Also see, **City of Carmel**, 123 F.3d at 1150-51 ("... the National Environmental Policy Act requires a 'reasonably thorough' discussion of the environmental consequences in question, not unanimity of opinion, expert or otherwise."). In making this determination, a court must make a " 'pragmatic judgment whether the environmental impact statement's form, content, and preparation *foster both informed decision-making and informed public participation*.'" **Churchill County**, 276 F.3d at 1071; **City of Carmel**, 123 F.3d at 1150-51 (*emphasis added*).

*The APA analysis looks to a review of reasonable decision alternatives, as indicia of an agencies' thoroughness.* In this instance, it seems that ODOT evaluated the impact of closing exit lanes, but made no evaluation of pedestrian and cycling interests regarding the bridge, despite congressional directives. An environmental impact statement must discuss "reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); **City of Carmel**, 123 F.3d at 1155. ODOT's action is contrary to congressional instruction, failing to provide FHWA with a reasonable alternative to address cycling and pedestrian goals.

The review of alternatives, again, intends to support the over-arching policy goal of informed decision-making and public participation. See, **Morongo Band of Mission Indians v. FAA**, 161 F.3d 569, 575 (9th Cir.1998) ("The *touchstone* for [the court's] inquiry is whether an environmental impact statement's selection and *discussion of alternatives fosters informed decision-making and informed public participation.*' ") (quoting **City of Angoon v. Hodel**, 803 F.2d 1016, 1020 (9th Cir.1986)).

*However, an agency is not allowed to create "straw arguments" to defeat, without evaluating congressionally mandated criteria.* An agency responsibility to evaluate "reasonable alternatives" emanates from the environmental impact statement's Purpose and Need section; "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13; see also **City of Carmel**, 123 F.3d at 1155 ("The stated goal of a project necessarily dictates the range of reasonable alternatives and *an agency cannot define its objectives in unreasonably narrow terms.*").

ODOT and FHWA decision-making did not in any remote fashion, conform to the "informed public decision-making" required by the APA process.

## B. The issuance of the TRO Will Prevent Irreparable Harm to Plaintiff

*Plaintiffs satisfy the second element of the formula, as they face irreparable harm should the ODOT plan proceed, exposing them to the health and safety risks previously described.*

The investment in the Innerbelt Bridge and highway represents a "once in a lifetime" opportunity, building a system for the next fifty years. This is Northeast Ohio's opportunity to get things right, right from the start. ODOT's opposition is all the more mystifying as it flies in the face of federal transportation trends favoring walking and cycling. The United States Department of Transportation ("US DOT"), which administers FHWA, has indicated very strong support for bicycle and pedestrian opportunities through federal transportation programs. Earlier this year, US DOT announced plans to revise criteria for evaluating some US DOT projects to support more cycling and pedestrian activities:

We are integrating the needs of bicyclists in federally-funded road projects. We are discouraging transportation investments that negatively affect cyclists and pedestrians. And we are encouraging investments that go beyond the minimum requirements and provide facilities for bicyclists and pedestrians of all ages and abilities. **Comments of Secretary Ray LaHood, US Department of Transportation. attachment D)**

ODOT's opposition will set back Cleveland residents, cyclists and pedestrians back a generation.

The Courts have been clear in identifying irreparable harm. Irreparable harm exists where there is a substantial threat of a material injury which cannot be adequately compensated through monetary damages. **Cleveland v. Cleveland Elec. Illum. Co.,** 115 Ohio App.3d 1, 684 N.E.2d 343 (Ct. App., Eighth Dist., Cuyahoga Cnty., 1996). Also see, **Convergys Corporation v. Tackman,** 169 Ohio App.3d 665, 2006-Ohio-6616 (First Dist., Ct. App., Hamilton Cnty., 2006), (involving an injunction to enforce a covenant not to compete, an actual threat of harm existed when an employee possessed knowledge of an employer's trade secrets and began working in a position that caused him to directly compete with the former employer). Also see, **Women's Med. Prof'l. Corp. v. Baird,** 277 F. Supp 2d. 862, 871 (S.D. Ohio 2003) (in an action instituted by an abortion clinic seeking a temporary restraining order to permit them to continue operating, denying women in the area access to abortion services constitutes irreparable harm because there is no remedy available at law for which women in the area could be compensated for the unavailability of abortion services).

The federal courts have recognized that claims with environmental aspects are not often remedied by dollars and a traditional calculation of financial damages, suggesting plaintiffs have satisfied the "irreparable harm" requirement: "The United States Supreme Court has recognized that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.' *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). **Citizens of Chappaqua v. US Dept. of Transportation,** 579 F.Supp.2d 427, 432 (S.D. N.Y. 2008). Few things are more permanent than an innerbelt bridge and highway system, planned to operate for fifty years or more. Without weighing cyclist and pedestrian interests, ODOT seeks to close off transportation options for the public.

***Irreparable harm has been found when there is significant detrimental effect.*** If the failure of
a court to issue an injunction would cause significant detrimental effect on a plaintiff's future,
the court may appropriately conclude that irreparable harm to the plaintiff would result:

> "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not
> fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban
> County Gov't,* 305 F.3d 566, 578 (6th Cir.2002). "However, an injury is not fully
> compensable by money damages if the nature of the plaintiff's loss would make the
> damages difficult to calculate." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th
> Cir.1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th
> Cir.1984)).
> The likely interference with customer relationships resulting from the breach of a non-
> compete agreement is the kind of injury for which monetary damages are difficult to
> calculate. "The loss of customer goodwill often amounts to irreparable injury because the
> damages flowing from such losses are difficult to compute. Similarly, the loss of fair
> competition that results from the breach of a non-competition covenant is likely to
> irreparably harm an employer." *Id.* at 512 (internal citations omitted). Such injuries are
> precisely what Plaintiff will suffer if Defendants are allowed to continue to breach the
> franchise agreement's non-compete clause. Accordingly, we find that Plaintiff would
> likely suffer an irreparable injury without the issuance of the preliminary injunction.
> **Certified Restoration Dry Cleaning v. Tenke**, 511 F.3d 550, 5434(6th Cir. 2007).

***Irreparable harm can certainly be found when damages would be difficult to calculate or are
unascertainable:***

> As for whether or not the harm is irreparable, we hold that, if the sale were permitted to
> close at the scheduled time, three specific immediate, irreparable injuries would result.
> First, the stock of the Corporation would not be readily marketable. Secondly, the
> ultimate damage to the Plan from diverting other assets into Corporation stock cannot be
> ascertained. Thirdly, and most importantly, no money damages could compensate for the
> unlawful voting at the annual meeting of shareholders stock acquired through this sale.
> **Dimond v. Retirement Plan for Employees of Michael Baker Corp.**, 582 F.Supp.
> 892, 899-900 (W.D.Pa., 1983).

Similarly, allowing ODOT to proceed with its innerbelt plan, without addressing its health and
safety obligations to cyclists and pedestrians, is a step that can be difficult to undo once ODOT
has proceeded down the path initiated by the approval of the 30% design stage.

***Ohio courts have found irreparable harm, based on the threat of harm to plaintiffs:***

In *Procter & Gamble Co. v. Stoneham*, this court held that to determine whether a party will suffer irreparable harm in the absence of an injunction, the moving party need not demonstrate actual harm. Rather *"a threat of harm is a sufficient basis on which to grant injunctive relief."* We further held that, in an action to enforce a noncompete agreement, an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him to directly compete with the former employer or the product line that the employee formerly supported. Thus, we held that the trial court had erred as a matter of law in holding that Procter&Gamble, as the party seeking the injunction, was required to prove actual harm. In this case, the trial court made the same error as the trial court in Stoneham. It denied Convergys's motion on the sole basis that Convergys had failed to show that it had suffered any actual harm. Because the trial court applied the wrong legal standard in denying Convergys's motion for a preliminary injunction, we sustain Convergys's sole assignment of error. (emphasis added).
**Convergys Corp. v. Tackman**, 169 Ohio App.3d 665, 666-67, 2006-Ohio-6616 (First Dist. Ct. App., Hamilton Cnty., 2006).

In reviewing the concept of irreparable harm, the Court's evaluate the circumstances and where no monetary award will satisfy as damages, irreparable harm may be indicated:

Plaintiffs do not seek monetary damages from the defendant. If they did, they would have an adequate remedy at law and the court would normally decline to provide equitable relief. *See Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100,102 (3d Cir.1988) (finding that "[t]he availability of adequate monetary damages belies a claim of irreparable injury [and a] purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement.").
**Miller v. Skumanick**, 605 F.Supp.2d 634, 646 (M.D. Pa. 2009),

Often, federal courts have engaged in balancing interests to determine "irreparable harm." In a dispute regarding the opening of a theme park, the district court balanced the potential cost to the parties and the potential for monetary compensation to address any damages:

HRP contends that FPI will suffer *no* irreparable harm from an injunction because any harm to FPI ( *e.g.,* delay in opening the park and costs to make further changes to it) can be remedied by money damages... In support of its claim that it *will* suffer irreparable harm if we grant plaintiff's motion, FPI complains that an injunction would delay the opening of the park past Memorial Day weekend, which inaugurates the summer holiday season, and perhaps keep it closed for all of the 107 days it expects to be open this year. This, of course, could be remedied by damages-assuming that HRP could pay them, a very big *if* since revenue losses could well exceed $300,000 *per day* -but it would seem on this record that HRP has few assets and has engaged in nothing more than speculative prospecting of late. Thus, FPI realistically could not expect to recover those prodigious losses. The balance here is not close. The harm to FPI would be catastrophic if we granted any injunction. HRP's harm if we deny the injunction would be minimal at worst.

**HRP Creative Services Co., LLC v. FPI-MB Entertainment, LLC**, 616 F.Supp.2d 481, 490-91 (Dist. Ct. Del., 2009).

Acknowledging a gap of information submitted to FHWA, the Northeast Ohio cycling community recently completed rider surveys on its own, posting observers at significant roadways to tally users of the Lorain-Carnegie Bridge (affidavit of Jim Sheehan, attachment G). The Lorain-Carnegie Bridge poses substantial safety risk (affidavit, attachment G), is often strewn with glass and other debris and frequently carries automobiles traveling in excess of the posted speed limit. Nevertheless, the bridge is a frequently used cycling and pedestrian route from Cleveland's westside into the downtown area.  The bike count identified high levels of users (cyclists, pedestrians and joggers), during the morning and evening commuting hours and the lunch period:

1. **May  19, 2010** -- 9-10am (count=29); 11am-12 noon (count=49); 12-1pm (count=72); 1-2pm (count=31); and
2. **May 20, 2010** -- 5-6pm (count=69).
**Sheehan Affidavit, Attachment D**

For both the noon hour on May 19th and the evening commute on May 20th, patron usage ***exceeded one rider, pedestrian or jogger per minute!***  Even higher volumes could be expected on a safe innerbelt bridge path.

The innerbelt plan poses substantial public health and safety risks:

- ■ *The innerbelt project will lead to the presence of  more and heavier trucks on Cleveland streets,* which pose greater safety risks due to their longer stopping distances;

- ■ *The innerbelt plan will increase the level of harmful diesel fuel emissions*, shifting health burdens to cyclists and pedestrians on or along the road;

- ■ The innerbelt plan, through the reduced highway access and exit points, will create *longer and more frequent car and truck idling* at the exits and along Cleveland streets, increasing congestion and decreasing air quality for cyclists and pedestrians on or along the road, which include the approved bike path;

- The innerbelt plan will *deny an access route for cyclists and pedestrians to and from downtown Cleveland via the proposed innerbelt bridge, decreasing safety* for them by mandating their use of longer alternate routes into the city, which is contrary to environmental and transportation laws and regulations mandating support for cycling and pedestrian transportation;

- *The innerbelt plan will reduce the area bike plan's already limited routes in the central city*, as congestion worsens; and

- *Alternative plans for cyclists lack details and have no demonstrable safety advantage.*

ODOT is preparing to implement its largest highway construction project ever in remediating the Innerbelt system and the Innerbelt Bridge. Absent injunctive relief, construction on the bridge can proceed with the 30% design approval and every step taken to implement the current 30% plan will close off or narrow future options. Allowing ODOT to proceed, without having first met its obligations to identify and evaluate the safety, health and cost burdens of their Innerbelt plan for cyclists and pedestrians, risks foreclosing remedies for pedestrians and cyclists, locking these deficiencies in place for generations to come.

## C. Injury to Others Caused by Granting TRO

Of course, the court must balance the potential injury to the defendant and the general public against the potential harm to plaintiffs. While plaintiffs are unaware of any specific adverse impact for others that would result from a Temporary Restraining Order, Defendant ODOT may assert that Ohio taxpayers and residents have been saddled with an unsafe innerbelt highway for too long, that Ohio taxpayers and residents deserve to have project proceed as expeditiously as possible to reduce costs and delay risks forfeiting Ohio's "fair share" of federal stimulus transportation infrastructure money.

Plaintiffs would agree with many of these assertions: ODOT *has saddled* Ohio taxpayers and residents with an unsafe innerbelt for far too long; Taxpayers *do* deserve to have infrastructure

priorities proceed expeditiously; Ohio **_does_** deserve its "fair share" of federal infrastructure spending. However, ODOT should not be able to engineer its own crisis, by failing to meet its obligations under federal transportation and environmental laws, than assert the crisis to exonerate and compel approval of their shortcomings.

Plaintiffs do not believe others would be injured by the granting of a Temporary Restraining Order, but if potential injuries are identified, plaintiffs believe they would be out-weighed by the interest of requiring ODOT to meet its obligations to cyclists, pedestrians and city residents, as identified in federal law and regulations. **_Defendant ODOT certainly should not be permitted to benefit from its own deficient conduct._**


## D. Public Interest Served by the Granting TRO

Ohio courts acknowledge that a Temporary Restraining Order should further the public interest. Plaintiffs assert the full discussion and dissemination of information and policy decisions based on an open process is a public benefit of its own. Very rarely, should a public agency be permitted to evade public analysis of its goals and methods. ODOT's conduct is woefully deficient and defendant should not be able to evade its obligations.

Defendant ODOT has been consistent in opposing the incorporation of cyclist and pedestrian interests into its transportation infrastructure projects, even drawing the criticism of co-defendant FHWA for failing to adequately incorporate cycling and pedestrian interests into planning and project development:

> There is a demonstrated need to improve upon the state of the practice regarding bicycle and pedestrian planning statewide. There is also a need to continue to educate engineers and planners alike in this area.
> **2009 FHWA Report, Executive Summary (Attachment E).**

Federal courts have acknowledged that the four part standard often devolves into a standard of likelihood to prevail on the merits and irreparable injury, as satisfying the public interest requirement as well. See, **Miller v. Skumanick**, 605 F.Supp.2d 634, 647 (M.D. Pa. 2009) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and

irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors.").

***Compelling government agencies to act in accordance with the law is absolutely consistent with protecting the public interest:***

> Concerning the question of whether the public interest would be served by the injunction, it is well-settled that "an overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *See Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed.Cir.2007); *see also Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed.Cir.1994)… Accurate and effective enforcement of trade laws serves the public interest. Hence, the public interest is served by enjoining the liquidation of Whirlpool's entries so that the correct assessment rate may be applied to those entries upon the final judgment in this case. *See* Whirlpool's TRO and Prelim. Inj. Mot. 6. The balance of hardships decidedly favors the injunction sought by Whirlpool.
> **Union Steel v. United States**, 617 F.Supp.2d 1373 (**US Ct. Intl. Trade, 2009).**

The issuance of a Temporary Restraining Order is a careful balancing of interests, to serve the broad public interest:

> Because the risk of actual voter fraud is minuscule when compared with the concrete risk that Michigan's policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of denying the stay of the preliminary injunction. The preliminary injunction eliminates a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process. Accordingly, the district court's preliminary injunction seeks to ensure that Michigan's elections are *more* fair, and to reach any other result would fly in the face of the very purpose of the NVRA.
> **U.S. Student Association Foundation  v. Land**, 546 F.3d 373, 389-90 (6th Cir.,  2008).

Similar to the Michigan voters, cyclists and pedestrians are being "railroaded" by the ODOT process and risk exclusion. A Temporary Restraining Order, under the current circumstances, is consistent with meeting the public's interests and represents the more fair result. ODOT's documents produced to guide the innerbelt project fail to address their obligation to review and analyze the project's impact on pedestrians and cyclists. More than thirty bridges in the interstate highway system provide pedestrian and cyclist access to their bridges (see attached).

Cyclist and pedestrian access to the Innerbelt Bridge crossing is consistent with the City of

Cleveland's Bikeway Master Plan and would leverage investment in the Towpath Trail, a park and street connector initiated in Summit County. The bridge connects the downtown employment district and the sports/entertainment district on the other side. Cleveland cyclists, pedestrians and residents should be entitled to consider these same connection options and be provided with the information, by their government, to make the appropriate evaluation.

***ODOT's Abbey Avenue Alternative:*** At a public hearing of the Cleveland, Ohio Planning Commission on November 6, 2009, ODOT released a plan that would revise a neighboring bridge ("Abbey Avenue alternative"). While pleased that ODOT, for the first time, acknowledged obligations to the safety of cyclists and pedestrians, ODOT's Abbey Avenue Alternative was woefully incomplete. ODOT has released no details, construction schedules or cost estimates for the ODOT alternative.

Rather than proceed directly over the innerbelt bridge, ODOT's Abbey Avenue alternative directs cyclists to an Abbey Avenue Bridge and the Lorain-Carnegie Bridge bike lane. However, there is no cycling and pedestrian advantage for the longer, proposed Abbey Avenue alternative. While adding distances of 1-2 miles may seem minuscule to motorists, they are significant for cyclists and very significant for pedestrians. Further, a cyclist or pedestrian traveling on the innerbelt bridge might be traveling in close proximity to cars and trucks traveling at 65 mph or more, but, the cyclist or pedestrian is separated by distance, a highway "break down" lane and some sort of concrete or steel barrier. By contrast, a cyclist or pedestrian traveling along the Lorain-Carnegie Bridge, volume that would rise as a result of the step ODOT contemplates, **is exposed and traveling alongside motor vehicle traffic, separated from traffic only by a thin line of paint**. Further, Lorain-Carnegie bridge traffic may be speeding as well. It is generally perceived that there is no marginal safety or survivability improvement for a cyclist or pedestrian struck at 45 mph, rather than 65 mph. The Abbey Avenue alternative plan lacked significant project details and compromises cyclist and pedestrian safety, speed and convenience.

Again, the consequences of the ODOT option is far from clear and can only be clarified by additional time made available through a Temporary Restraining Order and the dissemination of information and analysis required by law. ODOT decided last summer not to pursue cycling and pedestrian options on the innerbelt bridge, citing, among others, cost. Now that ODOT

acknowledges a need for cycling and pedestrian accommodation, by developing the Abbey Avenue alternative, ODOT needs to revisit the issue of bike lanes on the innerbelt bridge and the suggested cost burden. If the information and analysis is performed, the return for investing in an innerbelt bike/pedestrian option will be clearer.

The public will be well-served by taking time out to permit the review of the innerbelt project, evaluating the health and safety impact on cyclists, pedestrians and residents with the most comprehensive information available. The TRO would provide a "time out," provide ODOT with the time and opportunity to correct the shortcoming in its previously issued DEIS and EIS and identify the impact of its proposal on pedestrians and cyclists as required. Only then can the public really evaluate the merits of the ODOT innerbelt plan.

*The opportunity to walk and bike the innerbelt bridge would provide a healthy and practical connection to downtown Cleveland. Whether they bike, walk or drive, the Innerbelt Bridge should be available for all area residents.*

**Conclusion:**

A Temporary Restraining Order and preliminary injunction should be issued to prohibit ODOT from proceeding with its ill-conceived innerbelt project. ODOT has not met its obligations under federal transportation, environmental and administrative procedure law and will deprive plaintiffs and all city residents of remedies, if allowed to proceed. Plaintiffs have met their requirements under Ohio law:

- ❖ Demonstrating a sufficient likelihood of success on the merits,
- ❖ Identifying the risk of irreparable harm;
- ❖ Demonstrating there is no or insufficient potential injury to others resulting from granting the Temporary Restraining Order; and
- ❖ Through the Temporary Restraining Order, serving the public interest.

*The Ohio Department of Transportation has created a plan deleterious to the health and safety of Northeast Ohio cyclists, pedestrians and other Cleveland residents, without discharging its obligations under federal transportation and environmental laws.* Allowing

23

ODOT to proceed will compound the costs; create additional impediments for reforming the plan and forfeit additional time in crafting a successful plan which complies with ODOT's obligations under the law. Injunctive relief should be granted and ODOT should be enjoined from proceeding with its 30% innerbelt plan. ODOT must meet its obligations to evaluate the health and safety consequences of the plan for cyclists and pedestrians and protect their interests as well. *Investing in active transportation is a fiscally responsible step to help neighborhoods thrive, fully consistent with the needs of Northeast Ohio and the federal highway goals.* The cycling community is prepared to engage in steps to correct the ODOT gaps and assist in shaping the infrastructure projects to reflect local needs and state responsibilities.

*Cyclists and pedestrians are taxpayers too.*


Respectfully submitted,


_____
Kevin Cronin, S. Ct. # 0039891
The Brown Hoist Building
4403 Saint Clair Avenue
Cleveland, Ohio 44103
Kevin.cronin.ohio@gmail.com
Ph: 216 377 0615
Fx: 216 881 3928


## SERVICE

A copy of the foregoing Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support were sent, regular U.S. mail, this 13 th day of September, 2010 to:
Richard J. Makowski, Assistant Attorney General, Chief, Transportation Section, 150 East Gay Street, 22nd floor, Columbus, Ohio 43215 (and by email to Richard.Makowski @ohioattorneygeneral.gov); and
Lisa Hammond Johnson, counsel to defendant FHWA, Office of the US Attorney, 801 West Superior Avenue, Cleveland, Ohio 44113 (and by email to Lisa.Hammond. Johnson@usdoj.gov).


_____
Kevin Cronin

ODOT Home > Districts > District 12 > Deputy Director > **District 12 News**

**9/9/2010**
*Cleveland's New I-90 Innerbelt Bridge:*

## Apparent Winning Team for Historic Bridge Construction Revealed

*Winning proposal calls for completion of construction full year earlier than planned*

**CLEVELAND** *(Thursday, September 9, 2010)* - After nearly five weeks of expert technical evaluation - combined with a rev and a value-based cost comparison – the Ohio Department of Transportation (ODOT) and City of Cleveland are set to award c of the historic Interstate 90 Innerbelt Bridge to **Walsh Construction with designer HNTB Ohio Inc.** The total bid amount for in at only $287,400,000.

Engineers and experts from ODOT and the City teamed on a thorough process of evaluating three technical proposals for const westbound bridge.  In order to complete construction on this project faster, ODOT is using a unique design-build process in wl construction of the project are combined in a single contract.

Walsh Construction – who was recently named the third leading transportation contractor by Engineering News-Record magaz Corporation – named as the second leading bridge design firm in the August edition of Roads & Bridges magazine – scored hi technical elements, including the look and aesthetics of the new bridge.

The project team also proposed substantial completion of the project during the fall of 2013.  While minor operations would c summer of 2014, the project would be completed nearly one full year earlier than anticipated.

The Walsh proposal also includes unique elements including the use of steel which reflects the importance of the industry in th city.  The team will pursue "Greenroads" Certification and use LED lights for aesthetic, landscape and pedestrian lighting.

The team took a unique approach which ends the main span just east of Ontario Street allowing for a smaller, "Gateway" bridg and a landscaped embankment between the two bridges.  Reducing the length of main viaduct in this way would reduce the amo required and increase the amount of reused materials.

The team also pushed-back the pier closest to the Western Reserve Fire Museum and integrated it with the retaining wall struc opening views of the river valley.  The design also includes additional art panels along Ontario and E. 9th Streets.

Three teams were chosen in March to compete for this historic project, with each team submitted its proposals in August.  Tech as schedule, safety, quality management, construction plans, community outreach and sustainability – were evaluated by the OD team.

ODOT also listened to input from Cleveland-area residents on the proposed aesthetics of the new structure in each proposal.  I submitted comments to ODOT's website.

On Thursday, ODOT officials in Columbus revealed the sealed price proposals from each team – and combined the scores of t proposals to determine an apparent winning team. ODOT then has up to ten days to review the "best value" proposal before av

Before any major construction begins, the winning team will present Cleveland-area residents with another opportunity to prov aesthetic details through a series of public meetings. Construction is expected to begin in 2011.

For more information, log-on to www.Innerbelt.org.

###

**For more information contact:**
ODOT District 12 Communications Office at (216) 584-2006 or email D12.PublicInformation@dot.state.oh.us



**The Ohio Department of Transportation**
1980 West Broad Street, Columbus Ohio, 43223
Ted Strickland, Governor | Jolene M. Molitoris, ODOT Director
Privacy Statement | Advanced Search | Feedback

## ODOT Fails to Address The Health and Safety of Cyclists, and Denies Pedestrian and Cyclist Access to the Bridge, Contrary to Federal Transportation Regulations.

***The cycling community was pleased to assist in passage of the stimulus plan, as cycling and pedestrian infrastructure can rebuild our economy and our neighborhoods.*** The cycling community has done its part, but ODOT did not meet its obligations. Federal law and regulations, 23 U.S.C. 134 and 49 U.S.C. 5303 (a), 23 CFR 450.300, acknowledges the desire to increase cycling and walking:

> sets forth the national policy that the MPO designated for each urbanized area is to carry out a continuing, cooperative, and comprehensive multimodal transportation planning process ... to serve the needs of people and freight (including accessible pedestrian walkways and bicycle transportation facilities) and foster economic growth and development, while minimizing transportation-related fuel consumption and air pollution.

***ODOT fails to meet their responsibilities to cyclists and pedestrians and are far from the "shovel-ready" status called for by the innovative federal plan of the President and Congress.***

**23 CFR 652.5** establishes that "[t]he safe accommodation of pedestrians and bicyclists should be given full consideration during the development of Federal-aid highway projects, and during the construction of such projects." (g) (1) "Bicycle transportation facilities and pedestrian walkways shall be considered, where appropriate, in conjunction with all new construction and reconstruction of transportation facilities, except where bicycle and pedestrian use are not permitted .... (2) Transportation plans and projects shall provide due consideration for safety and contiguous routes for bicyclists and pedestrians."

<u>**Threatening Cyclist Safety on Approved Bike Lanes**</u>: By closing highway exits in the manner they have done, the ODOT proposal will increase street congestion, the level of harmful pollutants and provide less safety for cyclists, including areas where cyclists are encouraged to ride, under the county approved bike plan. If the ODOT plan is approved, it will put more cars and trucks on streets like the approved bikeway of Superior, as well as the highway feeder streets of E. 24th, E. 30th and E. 55th St., raising a number of concerns for cyclist and pedestrian safety.

Some of the risks:
- ***More and heavier trucks,*** with their longer stopping distances;
- ***Harmful diesel fuel emissions*** shift health burdens to cyclists and pedestrians on or along the road;

Exhibit #B
p2>63

- Fewer highway access and exit will create **_longer and more frequent idling_** at the exits and along feeder streets, decreasing air quality for cyclists and pedestrians on or along the road; and
- **_Reducing the area bike plan's already limited routes north and south in the central city_**, as congestion worsens.

**<u>Denying Bridge Access to Cyclists and Pedestrians:</u>** Pedestrian and cyclist access to the bridge represents an important economic and commercial concern for Cleveland and its residents. **23 USC § 217 (e)** establishes: "In any case where a highway bridge deck being replaced or rehabilitated with Federal financial participation is located on a highway on which bicycles are permitted to operate at each end of such bridge, and the Secretary determines that the safe accommodation of bicycles can be provided at reasonable cost as part of such replacement or rehabilitation, then such bridge shall be so replaced or rehabilitated as to provide such safe accommodations."

By contrast, ODOT says bicycle and pedestrian accommodation on the bridge is unnecessary as cyclists and pedestrians have alternative routes and low cycling and pedestrian demand, particularly due to NE Ohio weather, does not warrant the investment. **_ODOT exaggerates the value and suitability of the alternatives:_**

- **_The Flats roadway is an unsafe route_**, with a very high volume of trucks, broken pavement, poor lighting and, in winter, very limited visibility and limited non-road options for pedestrians.
- **_The Lorain-Carnegie and Detroit-Superior Bridges accommodations were laudable retro-fit plans, but a well-designed cycling and pedestrian opportunity on a new Innerbelt Bridge Project represents an extraordinary opportunity to get things right, right from the start._**
- **_The availability of alternatives hasn't prevented cyclist and pedestrian accommodation in other cities._** There are 15-20 highway bridges with cycling and pedestrian access.
- **_Bicycle and pedestrian accommodation on the Innerbelt Bridge would stand up to cost-benefit analysis._** Last summer, ODOT posted cost ranges it considered to be acceptable for all bridge options, yet successful cyclist and pedestrian accommodation has already been acknowledged to be well below these acceptable cost ranges.

**Cycling Provides a Big Bang for a Comparatively Low Level Of Investment:** The financial value of improved mobility, measured by fuel savings, greenhouse gas reductions, and business and individual health care savings, ranges between $10-65 billion, outstripping any public spending

costs in creating a bicycling and walking transportation infrastructure. Modest increases in bicycling and walking could lead to an annual reduction of 70 billion miles of car travel, with higher increases cutting as much as 200 billion miles per year. The decreased auto travel represent savings for Ohio businesses and individuals, equal to cutting oil dependence and greenhouse gas emissions from passenger vehicles by 3-8%.

**Section 102(2)(D) of NEPA** requires the responsible agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

The review of the impact and opportunity to advance cycling and pedestrian interests is hardly "rigorous" and often not even present. ODOT has not conducted an "exploration and an objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects."

*Investing in active transportation is a fiscally responsible step to recreate thriving neighborhoods, fully consistent with the needs of Northeast Ohio and the federal stimulus goals. The cycling community is prepared to engage in steps to correct the gaps and assist in shaping the infrastructure projects to reflect local needs.  However, as it presently stands, the ODOT plan is not "shovel ready."*

Kevin Cronin, Attorney at Law
The Brown Hoist Building
4403 Saint Clair Avenue
Cleveland, Ohio 44103-1125

Ph: 216.377.0615 or 216.374.7578
Email: kevin.cronin.ohio@gmail.com



U.S. Department
of Transportation

**Federal Highway
Administration**

**Ohio Division**

September 18, 2009

200 North High Street
Room 328
Columbus, Ohio 43215
614-280-6896
614-280-6876 Fax
Ohio.FHWA@fhwa.dot.gov

Director Jolene M. Molitoris
Ohio Department of Transportation
1980 West Broad Street
Columbus, OH 43223

In Reply Refer To:
HEO-OH

Subject: Record of Decision
    Cleveland Innerbelt Project
    CUY – 71/90 – 16.79/14.90, PID 77510

Dear Director Molitoris:

Enclosed per your request of September 11, 2009 is the Record of Decision dated September 18, 2009 for the Cleveland Innerbelt Project, CUY – 71/90 – 16.79/14.90, PID 77510. Alternative A (Northern Alignment Alternative), as identified within the FEIS/Section 4(f) Evaluation and the incorporated supporting documents/documentation, is approved for further development and implementation in compliance with the FHWA September 18, 2009 Record of Decision.

Please be aware that within the Record of Decision, the Federal Highway Administration (FHWA) has provided the *Project's* Section 4(f) approval, and the final acceptance/approval of the *Project's* March 2009 *Interchange Justification Study.*

Should the Ohio Department of Transportation have any questions or comments in regards to the FHWA decisions and approvals as documented in the Record of Decision please do not hesitate to contact me or my staff. Mr. Herman Rodrigo and Mr. Michael B. Armstrong will remain as the primary FHWA contacts for the Project. They may be contacted by calling (614) 280-6896 or by e-mail at the following address: ohio.fhwa@dot.gov

Sincerely,

For:

Patrick A. Bauer
Acting Division Administrator

Enclosure (1)



*Exhibit C*
*P. 2 of 2*

**Operation of Local Roads**
Local roads that are affected by the project have been evaluated based upon the projected 2035 traffic volumes, as discussed above. Improvements to local streets required to achieve acceptable intersection operations are included as project elements, such as the proposed Midtown connector and improvements to the intersections of freeway ramps with local streets. A summary of intersection operations is included on Page 3-13 of the DEIS. (Details regarding the operational analyses are included in the Access Modification Study, included in Appendix G on DVD.) From this table, it is clear that the proposed design will operate as good as or better than existing conditions at local street intersections.

The Chester Avenue and East 30th Street Intersection is the one exception within the Trench area. This intersection operates at LOS E during the PM peak. The high volumes on southbound East 30th Street coupled with the lane use of a pocket left and shared thru/right, overload this approach. To improve operation at this intersection, a southbound right turn lane would need to be added to East 30th Street. Adding this lane would require demolishing two buildings located in the northwest quadrant of the intersection that are currently occupied and designated for warehouse/light industrial uses. The minor problems at this intersection, occurring primarily on one approach and only during the PM peak period, will not impact the operation of the freeway or interchange. ODOT and FHWA have determined that it would be better to accept this minor capacity problem than to impact two buildings. Considered in context, this minor issue does not represent any substantial degradation of local street conditions compared to the No Build.

Thus again, it is FHWA's assessment based upon the above analysis of the Project's potential economic effects as founded in the identified fundamental elements that:

- Congestion will be improved in the build condition. The AMS (included on DVD in Appendix G) demonstrates that the local street system will operate as good as or better than existing conditions. Within the Trench area, there is only one exception located at the intersection of East 30th Street and Chester Avenue, which has been determined to be minor and does not represent a substantial degradation of local street conditions.

- Redirected access will have minimal impact on the overall traffic volumes in the Trench area. The build and no build traffic volumes, summarized in Table 6a and 6b above, illustrate that traffic volumes will go up on Chester Avenue and down on Prospect and Carnegie Avenues in close proximity to I-90. However, the overall traffic within the Trench will not change appreciably.

- The loss of direct access results in additional travel distances of two to three blocks on city streets, approximately 400-500 feet, which is minor compared to the overall size of the Trench area. The additional travel time on local streets will be more than offset by the overall travel time savings on the freeway through reduction of congestion, geometric and operational improvements.

- There is a demonstrated purpose and need for the project as a whole, and within the Trench area. The project will meet the needs for freeway through traffic, freeway-to-local, local-to-freeway, and local-to-local movements through improved mainline capacity, ramps that meet current standards, and local connectivity provided by city streets and the Midtown connector.

These issues, upon which economic concerns are fundamentally based, neither individually nor cumulatively, are anticipated to result in substantial impacts within the Trench area. Therefore, the fundamental issues leading to the concern regarding economic impacts have been determined to be insubstantial. As the FEIS and incorporated DEIS regional economic analysis indicates an overall economic benefit to the area, it has been determined that there will be no substantial economic effects within the Trench area. Continuing comments regarding this issue have not presented any new information to contradict these findings including continued comment from Midtown Cleveland, In. and the Cleveland Clinic as disclosed herein.

2. Second, the FEIS rejects the alternative proposed in the Comment by arguing that under Section 4(f) regulations, the project cannot maintain the existing highway access point at Carnegie Avenue because avoidance of the Juvenile Justice Center (the "Center") remains feasible and prudent. In fact, in view of Cuyahoga County's position that the Center will soon be empty and may be torn down, removing highway access to save the Center is imprudent.

# Review of Ohio Bicycle and Pedestrian
# Planning and Safety Efforts







**Performed by**
**Federal Highway Administration**
**Ohio Division**
**200 North High Street, Room 328**
**Columbus, Ohio 43215-2408**

**Review Team Members**
**Noel Mehlo – Transportation Planner, Review Team Leader**
**Joe Glinski – Safety Program Engineer**

**Report Completed, April 2009**

## Executive Summary

The Federal Highway Administration Ohio Division Office (Division Office) conducted a review of the bicycle and pedestrian planning efforts at the Ohio Department of Transportation (ODOT) and the Metropolitan Planning Organizations (MPOs) in the state. This review utilized the guidelines of a Quality Improvement Review (QIR) to provide some framework for the review in assessing how the bicycle and pedestrian planning efforts are administered by ODOT along with the MPOs in Ohio, and how improvements may be made accordingly. The approach of the review involved comparing the practices in the State of Ohio (from ODOT and from within all of the MPOs) *against* those of each of the other 50 States and certain localities nationally who engage in successful practices. The intent of comparing Ohio to these other areas was to highlight those successful practices and assess which practices could be brought to Ohio to improve overall planning efforts. The safety of bicyclists and pedestrians has emerged as a priority for the Division Office as well as for ODOT, the MPOs and local communities through the course of this review. This document describes the range of opportunities to improve conditions for bicycling and walking in terms of planning and safety in Ohio. Based upon the review, several key recommendations to improve overall Bicycle and Pedestrian program were identified:

- ODOT should explore working with the State legislators to more clearly define multimodal options such as bicycle and pedestrian accommodations.
- ODOT should consider the development of a Statewide Complete Streets policy that will aid in better planning and project delivery.
- ODOT should consider developing a comprehensive statewide bicycle and pedestrian plan.
- ODOT should establish policy and procedures that would address the Districts' roles and responsibilities in implementing and encouraging comprehensive planning for all modes statewide.
- ODOT should update ODOT Policy No 20-004(P) Policy on Accommodating Bicycle and Pedestrian Travel on ODOT Owned or Maintained Facilities and address the 2005 Division Office comments regarding the policy.
- ODOT/FHWA should develop a module of training to help transportation officials understand federal and State processes, design standards, obligations, etc.

This review has succeeded in conducting an assessment of the bicycle and pedestrian planning as it relates to Program and Procedures, Roles and Responsibilities, State Laws, ODOT's Bicycle and Pedestrian Policies Program and Practices, MPO Planning Efforts, the 2008 FHWA Ohio Division Questionnaire Results, and Safety. The Districts and the MPOs continue to demonstrate their abilities as good managers of the TE Program in terms of project delivery in addition to being good stewards of federal dollars. There is a demonstrated need to improve upon the state of the practice regarding bicycle and pedestrian planning statewide. There is also a need to continue to educate engineers and planners alike in this area. The review has identified opportunities for improvement, as well as best practices in Ohio and around the nation that can be implemented in the state. Safety for these modes of transportation is likewise important, and further improvements to reduce accidents, injuries and fatalities are called for. To address the review objective of assisting ODOT, MPOs and LPAs further develop in the area of bicycle and pedestrian planning and safety, the Division Office will meet with ODOT Central Office, Office of Local Projects and Office of Planning and select MPOs to discuss the above recommendations and determine which can feasibly be addressed, including working jointly with those offices. The Division Office will continue to offer technical assistance and will develop training that can be implemented statewide.

Attachment F

FTA 01-10
Wednesday, January 13, 2010
Contact: Paul Griffo
Tel.: (202) 366-4064

### Obama Administration Proposes Major Public Transportation Policy Shift to Highlight Livability
#### *Changes Include Economic Development and Environmental Benefits*

In a dramatic change from existing policy, U.S. Transportation Secretary Ray LaHood today proposed that new funding guidelines for major transit projects be based on livability issues such as economic development opportunities and environmental benefits, in addition to cost and time saved, which are currently the primary criteria.

In remarks at the Transportation Research Board annual meeting, the Secretary announced the Obama Administration's plans to change how projects are selected to receive federal financial assistance in the Federal Transit Administration's (FTA) New Starts and Small Starts programs. As part of this initiative, the FTA will immediately rescind budget restrictions issued by the Bush Administration in March of 2005 that focused primarily on how much a project shortened commute times in comparison to its cost.

"Our new policy for selecting major transit projects will work to promote livability rather than hinder it," said Secretary LaHood. "We want to base our decisions on how much transit helps the environment, how much it improves development opportunities and how it makes our communities better places to live."

The change will apply to how the Federal Transit Administration evaluates major transit projects going forward. In making funding decisions, the FTA will now evaluate the environmental, community and economic development benefits provided by transit projects, as well as the congestion relief benefits from such projects.

"This new approach will help us do a much better job of aligning our priorities and values with our transit investments" said FTA Administrator Peter Rogoff. "No longer will we ignore the many benefits that accrue to our environment and our communities when we build or expand rail and bus rapid transit systems."

FTA will soon initiate a separate rulemaking process, inviting public comment on ways to appropriately measure all the benefits that result from such investments.

###

The remarks can be found at **http://www.dot.gov/affairs/2009/lahood01132010.htm**